# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## NO. 03-23-00407-CV

---

**Michael Patrick O'Connor, Appellant**

**v.**

**Shannon Kathleen O'Connor, Appellee**

---

### FROM THE 428TH DISTRICT COURT OF HAYS COUNTY
### NO. 20-0424, THE HONORABLE DAVID D. FARR, JUDGE PRESIDING

---

## M E M O R A N D U M   O P I N I O N

Michael Patrick O'Connor (Mike) appeals the divorce decree that ended his marriage with Shannon Kathleen O'Connor (Shannon).[1]  Mike focuses on trial-court decisions relating to its characterization of a mineral interest as community property rather than his separate property.  He contends that the trial court failed to admit evidence of his father's donative intent, to consider a presumption regarding parental gifts, and to consider all applicable tracing methods.  We will affirm the decree.

## BACKGROUND

Mike and Shannon married in 1995.  Mike's mother died in April 2009, and Mike's father became the trustee of a trust in her name.  The trust's property held for Mike's father's benefit during his lifetime included mineral interests in land in McMullen County, Texas

---

[1] To avoid confusion from the parties' shared last name, we will follow the example of Appellant's brief and refer to him as "Mike" and to Appellee as "Shannon."

("mineral interests" or "mineral rights"). As trustee of that trust, Mike's father prepared a "Mineral Deed" effective November 1, 2009, transferring mineral interests to Mike and Mike's five siblings.[2] The deed states that, "[f]or an adequate consideration paid and received," the grantor "grants, bargains, sells, conveys and transfers" to Mike and his siblings equal shares in the mineral interests.

Mike testified that, a few days after the effective date of the Mineral Deed, his father gifted each of the siblings $12,000 from their mother's estate and told them to use that money to purchase the mineral interests from the trust. The documentary evidence included a carbon copy of a check dated November 19, 2009, for $12,000 to Mike; the carbon copy does not include a payor name, a signature, or an account number. The evidence also included a bank statement for a joint account of Mike and Shannon that contained entries for a November 23, 2009 deposit of $12,171 and a December 3, 2009 check for $11,130.50; these entries do not show who made the deposit or wrote the check, the source of the deposited funds, or the recipient of the check. Mike's sister testified that she and her siblings obtained equal shares of mineral interests from their mother's trust when their father gifted them $12,000 and directed them to deposit that money and write a check for a little over $11,000 to their mother's trust to buy the mineral interests. She testified that she received the check after the November 1 deed.

Shannon testified that from the exhibits "it looks to be the case" that Mike used the $12,000 check from his father to purchase the mineral interests, but also said "I don't know what the purpose of [the $12,000 check] was." She also said "I am not disputing that the 12,000—or that was a purchase of mineral rights, given the exhibits that we have. I don't know the nature of what went into that."

---

[2] The copy of the deed in the record is unsigned, but no party contends on appeal that the deed was not properly executed in 2009.

2

Mike testified that he created entities and opened bank accounts to segregate the mineral interests and other inherited property, plus the income they produced, from the community estate of his marriage. He produced an expert who testified about tracing various assets from that seed money. Shannon produced an expert who testified that the tracing of the mineral interests as separate property failed and thus the mineral interests and all income and proceeds growing from them were community property.

The trial court determined that the mineral interests conveyed to Mike were part of the community estate. It found that neither the identical-sum-inference nor the clearinghouse tracing methods applied because the transaction sums of the check received, deposit, and purchase price ($12,000; $12,171; and $11,130.50) did not match and because the deed recited on November 1, 2009, that "adequate consideration [was] paid and received." The court held that the language of the deed indicated that the mineral-interest transfer was complete on November 1, 2009, without any part of the $12,000 being exchanged. The court also found that Mike's testimony about the financial activities related to the $12,000 check was not credible. The court found:

> In this case, the Court applying the plain meaning of the Mineral Rights Deed restricted to the four corners of the contract and makes the following findings: (1) the deed was not a gift deed and contained no recitation of gift; (2) the mineral rights were sold for an unspecified amount of "adequate consideration" as recited in the deed; (3) said adequate consideration was tendered at the time of transaction on November 1, 2009 (any other finding would require the Court to believe that adequate consideration was an unrecited promise of future payment of $12,000.00, but there is no testimony or argument to support that finding); and (4) the transaction was concluded weeks before any of the proffered subsequent financial transactions.

The court then concluded that the mineral interests were community property and that all royalties Mike received during marriage flowing from the mineral interests were community

3

property. The court concluded that Mike failed to establish by clear and convincing evidence that he used separate property to acquire his interest in Ronnoco Holdings, L.P. The reconstituted community estate comprised more than $10 million with the inclusion of the proceeds from the mineral estate and resulted in an award of a much larger amount than Mike considered Shannon's just and right share of the properly constituted community estate.

## DISCUSSION

Mike contends that the trial court erred when it determined that the mineral interests he received from his mother's trust were community property. He contends that the interests were conveyed as a gift without consideration by his mother's trust and that he purchased the interests using a $12,000 gift of funds from his father. He argues that the trial court erred by excluding evidence of his father's donative intent, by ignoring a presumption that his father intended to convey the interest as a gift to Mike, and by failing to consider all applicable tracing methods. Overarching these issues is Mike's contention that the trial court improperly characterized the mineral interests as community property.

## I.  Error in the trial court's exclusion of Exhibit 7 was not preserved.

Mike asserts that the trial court erred by failing to admit evidence showing that his father intended to transfer the mineral interests to Mike as separate property when he directed conveyance of the interests from the Trust to Mike and gifted Mike $12,000 with which to purchase the interests from the Trust. Mike sought admission of Exhibit 7 attached to his accountant's report tracing community and separate property—an attachment that had been fully redacted when the remainder of the report was admitted as Petitioner's Exhibit 36. Mike described Exhibit 7 as a handwritten note from his father dated September 6, 2012, discussing

4

financial transactions in the ordinary course of business for his estate planning. Mike sought to introduce evidence to corroborate tracing evidence regarding his father's intent to overcome the Dead Man's Rule that prohibits testimony about uncorroborated oral statements made by the decedent. Tex. R. Evid. 601. Exhibit 7 was attached to Petitioner's Exhibit 36 and is fully redacted in the reporter's record.

To preserve a claim of error in exclusion of evidence, the proponent must inform the courts of the substance of the evidence by an offer of proof unless the substance was apparent from the context. *See* Tex. R. Evid. 103(a)(2); *Cheng v. Zhaoya Wang*, 315 S.W.3d 668, 673 (Tex. App.—Dallas 2010, no pet.). The party complaining of the exclusion must present the nature of the evidence with enough specificity that the trial court can rule on matters as they will be presented to the appellate court later; the specificity allows the appellate court to determine admissibility of the evidence and whether any exclusion was harmful. *See* Tex. R. App. P. 33.1; *PPC Transp. v. Metcalf*, 254 S.W.3d 636 (Tex. App.—Tyler 2008, no pet.). Counsel must describe the actual content of the testimony and not merely comment on the reasons for it. *In re N.R.C.*, 94 S.W.3d 799, 806 (Tex. App.—Houston [14th Dist.] 2002, pet. denied). The rules of evidence do not mandate a formal offer of proof, only a short, factual recitation of what the evidence would show to preserve the issue for appeal. *In re Marriage of Rangel*, 580 S.W.3d 675, 680 (Tex. App.—Houston [14th Dist.] 2019, no pet.) (citing *N.R.C.*, 94 S.W.3d at 806).

Mike contends that the content of the excluded Exhibit 7 was apparent from context, obviating the need for a formal offer of proof. He authenticated the document as his father's handwriting and claims he preserved error through this exchange about Exhibit 7:

> MR. WILLIE: Were you familiar with your dad keeping documents—or this particular document before you received it?

5

APPELLANT:  Yes, I was.

MR. WILLIE:  Did you—and how were you familiar with it?

APPELLANT:  Because upon my mom's passing, his attorney/accountant asked him to prepare the documents.  And he would put down what he was doing, as far as purchases, through the deal.  And he was involved with all of my brothers and sisters in making sure that these—the items that he did.

MR. WILLIE:  Did you see this document when he was alive?

APPELLANT:  I did not.

MR. WILLIE:  Okay. But you saw similar documents to this?

APPELLANT:  Yes. In handwriting and how he—all of his handwriting is there, how he spells—how he writes acre, especially his signature at the top—or his signature Fred O'Connor at the very top, which is what he went by.

…

MR. WILLIE:  The transactions that occurred in here that he wrote, does that mirror how he distributed this letter?

APPELLANT:  Yes.

…

MR. WILLIE:  And so this was written six months before he passed away?

APPELLANT:  That is correct.

MR. WILLIE:  Okay. And did the transactions that we're taking about occur during his lifetime or at the time that his estate was—

APPELLANT:  These transactions occurred during his lifetime.

…

MR. WILLIE:  Do you know whether or not this was the type of document that your dad kept as part of his estate planning?

APPELLANT:  Yes. My dad was very—upon—even prior to my mom's passing, when she received mineral rights and the farm—farms, that he kept detailed records like this of purchases that he made and which accounts.

6

While this exchange explains that the document shows the transactions Mike's father made, it does not describe the transactions or illuminate what his intent was in making them. The testimony describes the general *type* of information the document contains (information about transactions and intent) but does not indicate the *substance* of the contents (what the transactions and intent were). As articulated in *N.R.C.*, the exchange at most comments on the reason to admit the exhibit but does not indicate to the trial court or this Court its content. *See* 94 S.W.3d 799, 806.

This exchange contrasts with the case Mike cites as support for his argument that he preserved error. *Mercer v. State*, No. 13-07-00412-CV, 2008 WL 2930290, at *1 (Tex. App.—Corpus Christi-Edinburg July 31, 2008, no pet.) (mem. op.). That case concerned the court's prohibition of a line of questioning intended to impeach the applicant for a protective order. *Id.* The applicant had first made an affidavit denying wrongdoing by the alleged assailant, then recanted the affidavit in testimony at the protective-order hearing. The alleged assailant's attorney sought, but was prevented from, questioning the applicant about her adherence to her DWI probation and from asking another witness if he had seen her drink alcohol—a violation of her probation terms. *Id*. at *1-2. The court of appeals held that the appellant preserved error from this exclusion because the questions asked showed that the alleged assailant wanted to impeach the applicant's credibility; indeed, counsel stated explicitly, "I'm going to the credibility of this witness and the fact that she said she was in good standing and we have reason to believe that she's actually broken some of the terms of her [DWI] probation." *Id*. at *2. Instead of statements only about the category of the testimony (that Mike was aware his father kept notes about his estate planning), the *Mercer* record contains statements

7

showing the substance of the excluded questions/testimony (applicant's purported violations of her DWI probation terms).

The deficiency in preservation in this case is clearer if we consider how we would assess harm. Mike argues that the exclusion of the evidence is harmful because it prevented him from showing his father's intent in making the transfers, while Shannon argues that the evidence is cumulative. Finding harm from the exclusion of evidence or harmlessness from cumulation requires knowing what the excluded evidence would have shown. Lacking a record of what Mike would have testified or what the notes would have shown, the record does not permit us to know what substance was missing or to compare the excluded evidence to the admitted evidence. Mike did not preserve our ability to assess the error or harm from it.

We resolve Mike's challenge to the exclusion of exhibit 7 in favor of the judgment.

## II. There is no showing that the trial court failed to consider the presumption that a parent-to-child gift is the child's separate property.

Mike argues that the trial court erred by failing to consider the presumption that a parent-to-child transfer of property is a gift. He contends that proper application of this presumption would have changed the characterization of the transferred mineral interests to be his separate property whether through the transfer of the interests themselves or through the gift of funds used to purchase those interests.

Property acquired by either spouse during the marriage is community property unless it is separate property. Tex. Fam. Code § 3.002. Property owned or claimed by a spouse during or on dissolution of a marriage is presumed to be community property. *Id*. § 3.003(a). This presumption can be defeated by clear and convincing evidence of the separate nature of

8

the property's ownership. *Id*. § 3.003(b). Separate property includes property acquired by the spouse during marriage by gift, devise, or descent. *Id*. § 3.001(2). When a person conveys property to a natural object of the grantor's bounty, such as a parent to a child, it creates a presumption that the property conveyed is a gift. *Kyles v. Kyles*, 832 S.W.2d 194, 197 (Tex. App.—Beaumont 1992, no writ).

Mike cites a passage from the trial court's explanation of its decision in its docket notes, described as a rendition on final trial on the merits and its "[r]uling as to final divorce and remaining property issues including division" on April 21, 2023.[3] The trial court used similar language in its findings of fact and conclusions of law as quoted above in the background

---

[3] Mike cites to this passage from the docket-sheet note:

> In this case, the Court applying the plain meaning of this mineral rights deed restricted to the four corners of the contract then several findings are clear: (1) the deed was not a gift deed; (2) the mineral rights were sold for an unspecified amount of adequate consideration; (3) said adequate consideration was tendered at the time of transaction on 11/1/2009 (any other finding would require the Court to believe that adequate consideration was the promise of the $12,000.00 and there is no testimony or argument to support that finding); and (4) the transaction was concluded weeks prior to any of the financial transactions which demonstrate the $12,000.00[.]

The court's note continued, "Based on all of the above, the Court finds that the Mineral Rights Deed (dated 11/1/2009) transferred rights which were community property by inception of title doctrine under Texas law . . . ."

It is not clear that we can consider this note. "An appellate court may not consider docket entries since they are only made for the clerk's convenience and are usually unreliable." *Rush v. Barrios*, 56 S.W.3d 88, 95-96 (Tex. App.—Houston [14th Dist.] 2001, pet. denied); *Medrano v. Zapata*, No. 03-12-00131-CV, 2013 WL 6921500, at *5, n.11 (Tex. App.—Austin Dec. 31, 2013, no pet.) (mem. op.). The *Rush* court cited cases involving clerical or procedural issues as the limited circumstances in which docket entries could be considered. *See* 56 S.W.3d at 95-96. The *Rush* court held consideration of the notes in the docket especially inappropriate because it would be reviewing the notes as if they were findings of fact and conclusions of law, which were not filed in that case. *Id*. at 96.

section. Neither the docket-sheet notes nor the findings and conclusion reflects that the trial court refused to consider the parental-gift presumption. The court's rejection of Mike's argument does not show a refusal to consider that presumption. The trial court discussed evidence rebutting that presumption. *See Kyles*, 832 S.W.2d at 197 (holding that parental-gift presumption is rebuttable).

We resolve the issue of whether the trial court erred by failing to consider the parental-gift presumption concerning the deed itself in favor of the judgment. We reserve for discussion below the effect of the application of the parental-gift presumption to the deed and the $12,000 check on the trial court's characterization of Mike's mineral interest as community property.

III. **Mike did not show that the trial court abused its discretion by failing to consider all applicable tracing methods in characterizing the mineral interests.**

Mike contends that the trial court erred when it failed to consider all other tracing methods that support the separate-property characterization of the mineral interests. He notes that tracing methods include the community-out-first method, the clearinghouse method, the identical-sum-inference method, and the minimum-sum-balance method. He contends that the community-out-first method and the identical-sum-inference method both support characterizing the mineral interest as his separate property, and that the trial court failed to properly use applicable tracing methods to support its conclusion. He relies on a "ruling" by the trial court that the identical-sum method is not applicable and the absence of any reference to any other tracing method. He argues that because "the trial court did not identify the exact tracing method used in its ruling and abused its discretion in basing its decision without evidence of a substantive and probative character," we may rely on any tracing method supported by the

10

record. *See Sloan v. Sloan*, No. 02-23-00361-CV, 2024 WL 4509728, at *10, n.25 (Tex. App.—Fort Worth Oct. 17, 2024) (mem. op.).

The "ruling" Mike refers to appears to be from the clerk's record document in which the trial court detailed "Docket sheet entries to be submitted to court's docket sheet" which states in part:

> The Court finds that the application of the identical sum method which involves only one deposit followed by an identical withdrawal made within a short time frame is not applicable here as there are at least four sums in contention which are $12,000.00; $12,171.00; $11,130.50 and, arguably, "adequate consideration paid and received" when applied to the mineral rights deed . . . .

These April 21, 2023 notes are under the heading "rendition on final trial on the merits." We find language similar to the docket-sheet entry in the findings of fact and conclusions of law filed by the court on July 20, 2023. There the trial court additionally states that it finds the use of the clearinghouse method inapplicable for the same reason it rejected application of the identical-sum method.

Critically, we are not pointed to anywhere in the record—e.g., the reporter's record, the decree, the findings of fact and conclusions of law, or an implication from the refusal to make a requested finding of fact or conclusion of law—that reflects that the trial court refused to consider any other tracing method, such as the community-out-first method or the minimum-sum-balance method. We must presume the trial court knows and correctly applies the law. *Coons-Andersen v. Andersen*, 104 S.W.3d 630, 633, n.1 (Tex. App.—Dallas 2003, no pet.).

Mike has not shown a failure by the trial court to consider relevant tracing methods. We will next review whether Mike has shown error in the trial court's application of the law to the evidence admitted.

11

**IV.** **The record does not show error in the trial court's conclusion that the mineral interests were community property.**

Overarching Mike's issues and arguments is a contention that the trial court erroneously determined that the mineral interests were community property. *See Rohrmoos Venture v. UTSW DVA Healthcare, LLP*, 578 S.W.3d 469, 480 (Tex. 2019) (requiring that courts "broadly construe issues to encompass the core questions and to reach all issues subsidiary to and fairly included within them."). Mike requests that we reverse the award of community property to Shannon and remand for a reconsideration of the division of the revised community estate.

**A. Standards of review**

We review a trial court's property division—including its characterization of property as separate or community—for an abuse of discretion. The trial court lacks authority to divest a spouse of separate property, so if the trial court mischaracterizes a spouse's separate property as community property and awards it to the other spouse, the trial court abuses its discretion and reversibly errs. *Kelly v. Kelly*, 634 S.W.3d 335, 348 (Tex. App.—Houston [1st Dist.] 2021, no pet.); *see also Eggemeyer v. Eggemeyer*, 554 S.W.2d 137, 140 (Tex. 1977). Within this abuse-of-discretion determination is a determination of whether one spouse proved by clear and convincing evidence that property held by the spouses at the time of divorce belonged to one spouse's separate estate. *See Kelly*, 634 S.W.3d at 347. We assess whether the court had sufficient information upon which to exercise its discretion and whether it erred in its application of that discretion; a factor in that determination is whether legally or factually sufficient evidence supports the court's decision. *Id.* at 346. These standards are, in brief:

- A trial court abuses its discretion when it rules arbitrarily, unreasonably, without regard for guiding rules or principles, or without supporting evidence. *Kazmi v. Kazmi*, 693 S.W.3d 556, 566 (Tex. App.—Austin 2023, pet denied) (citing *Transcor Astra Group S.A. v. Petrobras Am. Inc.*, 650 S.W.3d 462, 482 (Tex. 2022)).

- "'Clear and convincing evidence' is the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code § 101.007; *Ganesan v. Vallabhaneni*, 96 S.W.3d 345, 354 (Tex. App.—Austin 2002, pet. denied); *see also Goyal v. Hora*, No. 03-19-000868-CV, 2021 WL 2149628, at *5 (Tex. App.—Austin May 27, 2021, no pet.) (mem. op.) (describing "higher standards of review" for legal and factual sufficiency when burden of proof is clear and convincing evidence).

- In reviewing for legal sufficiency, "we view the evidence in the light most favorable to the verdict, crediting favorable evidence when reasonable jurors could do so and disregarding contrary evidence unless reasonable jurors could not." *Pike v. Texas EMC Mgmt., LLC*, 610 S.W.3d 763, 794 (Tex. 2020). When an appellant attacks the legal sufficiency of an adverse finding on an issue for which the appellant bore the burden of proof, the appellant "must demonstrate on appeal that the evidence establishes, as a matter of law, all vital facts in support of the issue." *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 241 (Tex. 2001).

- In reviewing for factual sufficiency, "we examine the entire record and consider and weigh all the evidence, both in support of and contrary to the challenged finding." *Ortiz v. Jones*, 917 S.W.2d 770, 772 (Tex. 1996). To prevail in a factual-sufficiency challenge, a party who had the burden of proof at trial must demonstrate that the adverse finding is against the great weight and preponderance of evidence, and we will reverse only if, in light of the entire record, the evidence supporting the finding is so weak or the finding is so contrary to the overwhelming weight and preponderance of the evidence as to be clearly wrong and unjust. *See Dow Chem.*, 46 S.W.3d at 241.

When assessing the evidence against these standards, we must also bear in mind that the trial court is the sole judge of the credibility of witnesses and the weight to be given their testimony. *See Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003); *In re Estate of Scott*, 601 S.W.3d 77, 88 (Tex. App.—El Paso 2020, no pet.). In a bench trial, the trial court has the right to accept or reject any part or all of a witness's testimony. *See Golden Eagle*,

13

116 S.W.3d at 774; *Wilson v. Wilson*, No. 03-03-00196-CV, 2004 WL 524465, at *1 (Tex. App.—Austin Mar. 18, 2004, no pet.) (mem. op.). The court may believe one witness and disbelieve others and may resolve inconsistencies in any witness's testimony. *Dwairy v. Lopez*, 243 S.W.3d 710, 713 (Tex. App.—San Antonio 2007, no pet.). We cannot pass upon the witnesses' credibility or substitute our judgment for that of the factfinder. *4922 Holdings, LLC v. Rivera*, 625 S.W.3d 316, 325 (Tex. App.—Houston [14th Dist.] 2021, pet. denied).

"Parties claiming certain property as their separate property have the burden of rebutting the presumption of community property." *Goyal*, 2021 WL 2149628, at *5 (quoting *Pearson v. Fillingim*, 332 S.W.3d 361, 363 (Tex. 2011)). "Where an asset is purchased during marriage with monies traceable to a spouse's separate estate, the asset may appropriately be characterized as separate property." *Rivera v. Hernandez*, 441 S.W.3d 413, 419-20 (Tex. App.—El Paso 2014, pet. denied) (citing *Pace v. Pace*, 160 S.W.3d 706, 711 (Tex. App.—Dallas 2005, pet. denied)). "Tracing involves establishing the separate origin of the property through evidence showing the time and means by which the spouse originally obtained possession of the property." *Ganesan*, 96 S.W.3d at 354.

Even when there is testimony that property possessed at the time the marriage is dissolved was separate property, the clear-and-convincing-evidence standard requires documentary evidence tracing the separate nature of the property. *Eichhorn v. Eichhorn*, 2022 WL 1591709, at *3 (Tex. App.—Austin May 20, 2022, no pet) (citing *Barras v. Barras*, 396 S.W.3d 154, 164 (Tex. App.—Houston [14th Dist.] 2013, pet. denied)). Testimony that property was purchased with separate-property funds, without any tracing of the funds from their inception to the relevant purchase, is on its own insufficient to rebut the community-property presumption. *McElwee v. McElwee*, 911 S.W.2d 182, 188 (Tex. App.—Houston [1st Dist.]

1995, writ denied); *see also Goyal*, 2021 WL 2149628, at *6; *Ganesan*, 96 S.W.3d at 354 (concluding that husband failed to overcome community-property presumption as to certain retirement and brokerage accounts because neither his testimony nor his exhibits provided "statements of accounts, dates of transfers, amounts transferred in or out, sources of funds, or any semblance of asset tracing"). We should not resort to surmise and speculation about the nature of funds in accounts held by a spouse upon the dissolution of a marriage. *See McKinley v. McKinley*, 496 S.W.2d 540, 543-44 (Tex. 1973).

B. **The record supports the determination that the deed was transferred for consideration.**

Mike contends that the mineral interests are his separate property because parent-to-child transfers of real property are presumed to be gifts. *See Kyles*, 832 S.W.2d at 197. He asserts that parental gifts to their children are presumed to be the child's separate property even when the transferring deed recites an exchange of consideration. *Jennings v. Piazza*, No. 12-18-00253-CV, 2019 WL 2710276, at *5 (Tex. App.—Tyler June 28, 2019, no pet.) (mem. op.). This contention challenges the trial court's findings that the deed was not a gift deed, contained no recitation of a gift, and recited that the mineral interests were sold November 1, 2009, for an unspecified amount of "adequate consideration."

To prove that a transfer of realty by deed was a gift making the transferred property part of a spouse's separate estate under Family Code section 3.001(2), the transferee must prove donative intent, delivery of the property, and acceptance of the property. *Troxel v. Bishop*, 201 S.W.3d 290, 297 (Tex. App.—Dallas 2006, no pet.). The presumption that a transfer of realty from parent to child is a gift is rebuttable by clear and convincing evidence. *York v. Boatman*, 487 S.W.3d 635, 642 (Tex. App.—Texarkana 2016, no pet.); *Kyles*,

15

832 S.W.2d at 197. Money does not have to change hands at the time of a sale in order for the sale contract to be supported by consideration:

> It is not necessary that the sales price or any part of it be paid at the time the contract of sale is executed, in order for the contract to be binding and to be supported by consideration. The mutual promises—one by the seller to sell and one by the buyer to buy and pay for the land—are sufficient consideration to make the contract binding.

*Cowman v. Allen Monuments, Inc.*, 500 S.W.2d 223, 227 (Tex. App.—Texarkana 1973, no writ).

Mike's own evidence is sufficient to rebut the presumption and demonstrate that the deed itself showed it was not a gift. In addition to the language in the deed stating that the interests were sold for adequate compensation, Mike testified that he wrote a check that "went to the trust of Joanne O'Connor for mineral purchase." His sister testified that she and her siblings received a check from their father "to purchase our individual mineral rights." Steve Peña, Mike's expert witness on tracing, testified that Mike's father "gave each of the children $12,000 to purchase the mineral interest from the trust." When asked, "Do you recall how Mr. O'Connor received the mineral interest?" Peña testified, "Yes. He received it as a result of a purchase of one-sixth of the mineral interest from his mother's estate, and he purchased it with the $12,000 gift from his father." This evidence distinguishes this case from *Jennings*, in which the court concluded that the gift presumption prevailed when there was no evidence that the consideration stated in the deed was paid. *See* 2019 WL 2710276, at *5.[4] If the deed was a gift, these

---

[4] This case is also factually distinct from those in which the parents paid the full purchase price for property then puts the deed in the child's name. *See Somer v. Bogart*, 749 S.W.2d 202, 203-04 (Tex. App.—Dallas, writ denied), *approved* 762 S.W.2d 577 (Tex. 1988) (writing on rehearing of writ denial to approve holding that burden to refute presumption of gift is clear and convincing evidence). There is no evidence that Mike's father directly paid the full purchase price for the property for Mike (or his siblings). As concerns the property transaction, the only evidence is that Mike paid the trust for the property.

transactions were unnecessary. This evidence also indicates the intention for these payments was the unspecified consideration for the November 1, 2009 transfer.

The record contains legally and factually sufficient evidence to support a finding by clear and convincing evidence that the deed was not a gift to Mike. We will next review the trial court's determination that Mike did not adequately trace any separate-property funds used to purchase the mineral interests.

**C.** **The record supports the determination that Mike did not adequately trace funds used to purchase the mineral interests as his separate property.** [5]

Mike contends that he proved by clear and convincing evidence that the mineral interests are his separate property because he used separate-property funds gifted by his father on November 19, 2009, to purchase the interests from his mother's trust. Mike contends on appeal that he traced the separate funds from their deposit into his and Shannon's joint bank account through their use to purchase the mineral interests with the December 3, 2009 check under any of three tracing methods: community-out-first, clearinghouse, and identical-sum methods. Shannon contends that the record supports the trial court's rejection of Mike's tracing claims under the latter two theories and that his expert deemed the community-out-first method inapplicable.[6]

As set out above, Mike and his sister testified that in the weeks after their father transferred the mineral interests to them and their siblings by deed for "consideration paid and

---

[5] The trial court held that the deed evidenced a transaction that was completed for consideration on November 1, 2009. The trial court also examined whether Mike later that month used separate funds for the purchase of the mineral rights. We will review that determination as well.

[6] The expert's testimony preceded admission of a bank statement showing account transactions; when that statement was later admitted, the expert's approach changed somewhat.

received," his father gave a check for $12,000 to all of the siblings that they then used to purchase the mineral interests from their mother's trust. Mike testified that the checks were for $12,000 because that was the maximum gift allowed by the Internal Revenue Service at the time. Shannon testified that from the exhibits "it looks to be the case" that Mike used the $12,000 check from his father to purchase the mineral interests, but also said "I don't know what the purpose of [the $12,000 check] was."

Whatever Mike's family's intentions were, sufficient evidence supports the trial court's determination that the documentation does not adequately trace the funds as separate. The court admitted a carbon copy of a November 19, 2009 check to Mike and two entries in a November-December 2009 statement for Mike and Shannon's joint checking account. The copy of the check written to Mike O'Connor for $12,000 does not have the account number, signature of its maker, or memorandum of its purpose as gift or otherwise. There is a November 23, 2009 deposit of $12,171 and a December 3, 2009 check for $11,130.50; the statement does not list which of the account owners participated in the transactions or name the other party to either transaction. Mike testified that the $12,171 deposit included a $12,000 check from his father's checking account along with $171 of unknown origin; he said he was not receiving $12,000 checks from anyone else at that time. He testified that he wrote a check for $11,130.50 to his mother's trust for the mineral interests. In between the transactions are deposits totaling $1,991.30 and withdrawals totaling $5,248.75. The transaction history of Mike and Shannon's checking account shows deposits of $25,182 and withdrawals of $24,063.73 for the month.

Shannon's expert, Robert Metz, testified that tracing could not be shown because the $12,000 "was never traced into an account and then a withdrawal subsequently traced to the purchase of any minerals." Even after the admission of the bank account statement, he testified

18

that he would trace the entire $12,171 deposit as community funds "[b]ecause I don't think there's been sufficient support that the 12,171 has any separate property component to it." He said that he would want to see documentation that the $12,000 from the check was part of the $12,171 deposit four days later.

The trial court made findings about the documentary evidence. It found that the $12,000 carbon copy lacked the name of the payor. It also found that the amounts of the carbon copy ($12,000), the deposit ($12,171), and the check ($11,130.50) were "incongruent." The trial court found that the bank statement's listing of the $12,171 deposit did not indicate the nature of the deposit and was not accompanied by cancelled checks or a deposit receipt. The trial court also found that the bank statement's listing of the $11,130.50 check did not indicate the nature of the payment purpose or the payee.

Under any tracing theory, Mike faces a fundamental problem in that the record supports a finding that he did not show by clear and convincing evidence that he received $12,000 in separate funds. We will examine each of the proposed tracing methods in turn.

### 1. Community-Out-First method

The trial court did not make an express finding or conclusion regarding use of the community-out-first method. Mike contends that, because the trial court did not expressly reject all tracing methods, we can explore any theory of tracing that is supported by the record. *See Sloan*, 2024 WL 4509728, at *10, n.25.

Using the community-out-first method, when separate and community property are commingled in a single bank account, we presume the community funds are drawn out first, before separate funds are withdrawn. *Zagorski v. Zagorski*, 116 S.W.3d 309, 316 (Tex. App.— Houston [14th Dist.] 2003, pet. denied). The only requirement for tracing and the application of

19

the community-out-first presumption is that the party attempting to overcome the community presumption must produce clear evidence of the transactions affecting the commingled account. *See id.* (citing *McKinley*, 496 S.W.2d at 543-44).

On the first day of his testimony, Mike's expert Peña testified that tracers generally use the community-out-first method with clearinghouse and identical-sum methods as "exceptions specifically reserved to certain kinds of transactions." He used the community-out-first method to trace separate property in other aspects of this case, but testified on cross-examination that the state of the record prevented him from using the community-out-first method regarding the funds used to purchase the mineral interests. This exchange followed a discussion of a hypothetical situation concerning the community-out-first method:

> Q. So it's a tracing method that you would apply if you have the documents to trace where the $12,000 came and went?
>
> A. Sure.
>
> Q. But you cannot apply clearinghouse or community out first or identical sum reference here because you have no tracing for where that $12,000 went in and went out, do you?
>
> A. That is correct.
>
> Q. You don't even have a bank statement where the $12,000 was deposited and then purportedly withdrawn to purchase the minerals, do you?
>
> A. That's the same statement that I cannot – I don't have, so I can't trace.

Peña testified that he relied on the mineral deed and the carbon copy of the $12,000 check to conclude that the mineral interests were Mike's separate property. When recalled after the admission of the bank statement the next day, Peña did not advocate for using the community-out-first method but opined that the ten-day span of activities and the limited account activity between the $12,171 deposit and the $11,130.50 allowed him to use the clearinghouse method.

20

Metz testified that, even if that $12,171 deposit had a separate-property component to it, there would still be a community component to it when applying the community-out-first method for the $11,130.50 check. He said that, if he were applying the community-out-first method, he "would trace that right now as all community. Because I don't think there's been sufficient support that the 12,171 has any separate property component to it."

We conclude that Mike has not shown error in the trial court's failure to find that he traced funds for his purchase of the mineral interests as separate property through the community-out-first method. The only testimony applying the community-out-first method to these particular funds is Metz's opinion that use of the method shows the $11,130.50 check to be community property. Mike has not shown that the trial court's failure to find—using the community-out-first method—that he purchased the mineral interest using separate funds is against the great weight and preponderance of the evidence or that the contrary finding is established as a matter of law. *See Dow Chem.*, 46 S.W.3d at 241.

### 2. Clearinghouse method

The trial court found that the clearinghouse method was not applicable to this case because there are at least three unequal sums presented by the evidence.

Peña testified that the clearinghouse method is used for exceptional items within a broader community-out-first tracing. The clearinghouse method presumes that when a spouse deposits separate property money into a commingled account and makes a subsequent purchase of a similar amount from that same account, the purchased asset may be traced as separate property. *In re Marriage of Moore*, No. 12-22-00286-CV, 2023 WL 3369399, at *6 (Tex. App.—Tyler May 10, 2023, no pet.) (mem. op.) (citing *Peterson v. Peterson*, 595 S.W.2d 889 (Tex. App—Austin 1980, writ dism'd.)). Peña said the clearinghouse method was appropriate

21

when the deposited separate funds are used within a short period of time; he testified that he had seen as much as six weeks between deposit and withdrawal allowed to prove the separate property retained its character under the clearinghouse method.

The amount withdrawn from the community-property account does not have to equal the amount of separate funds deposited to prove tracing under the clearinghouse method. In *Estate of Hanau v. Hanau*, the court held that a husband sufficiently traced his separate property interests when he deposited into his separately held brokerage account $6,021 in proceeds from the sale of stock that was separate property then withdrew $6,170 the same day to purchase other stocks. 730 S.W.2d 663, 666 (Tex. 1987). The Texas Supreme Court held that the husband's account had "not been commingled" and that no other transactions occurred on the days in question "which would have planted the seeds of doubt upon the possible source of the funds used to buy the stocks." *Id*. at 667. In *Higgins v. Higgins*, a husband deposited a $71,200 gift and $20,000 in proceeds from the sale of an interest in inherited land—his separate property—into a joint bank account, from which he withdrew $90,000 to purchase additional land. 458 S.W.2d 498, 499 (Tex. App.—Eastland 1970, no writ). The jury found that the husband had "given" the separate funds to the community, *id.* at 499-500, but the trial court disregarded those findings. *Id.* at 500. The court of appeals concluded under then-prevailing law that a spouse could not gift separate property to the community estate. *Id.* at 501. *But cf.* Tex. Const. art. XVI, § 15 (amended in 1999 to provide that "spouses may agree in writing that all or part of the separate property owned by either or both of them shall be the spouses' community property."). Though the amounts deposited and withdrawn differed slightly, the court of appeals found that their separate nature was sufficiently traced because the husband "deposit[ed] said sums in their joint account and immediately pa[id] them out on the purchase price of said ranch."

22

*Higgins*, 458 S.W.2d at 501. In *Peterson*, this Court held that a husband had traced the funds used to purchase a house to his separate property. 595 S.W.2d at 892. The husband had made a down payment before the marriage and less than a month after the wedding paid the balance of $32,973.64 from an account into which he had deposited $35,000 from the sale of inherited property. *Id*. No evidence was introduced to establish the balance of the account on the date of marriage or detail any post-wedding transactions. *Id*.

In none of these cases, however, was documentation of the tracing of the separate funds through a joint bank account made an issue on appeal. Unlike in *Hanau*, 730 S.W.2d at 667, here separate funds have been commingled with community funds. Unlike in *Higgins*, 458 S.W.2d at 500, there was no finding that separate funds were purportedly given to the community, only that the separate funds here were not sufficiently traced from their source or to their recipient. Also, the court of appeals in *Higgins* held that the recipient of the funds spent them on the ranch purchase "immediately" after their deposit in the joint account, *id.* at 501, while here there was a ten-day gap between deposit and withdrawal. This case is unlike *Peterson*, 595 S.W.2d at 892, in which the wife admitted that her only financial interest was in maintaining the home landscaping and furniture.

Peña testified that, based on trial testimony he had heard, he believed that the $12,000 carbon was a copy of a check from Mike's father and therefore a gift and separate funds; that the $12,171 deposit in the bank statement four days after the check's date included the $12,000 check from Mike's father; and that the $11,130.50 check written ten days later that he believed was made to Mike's mother's trust to purchase the mineral interest was derived from the $12,000 in separate funds. Peña conceded, however, that he did not have any documentation

23

of the contents of the $12,171 deposit and did not have documentation of the payee of the $11,130.50 check.

Metz testified that he had heard testimony about the transactions at issue, but had not seen a check from Mike's father to Mike for $12,000, had not seen documents showing what comprised the $12,171 deposit on November 23, 2009, and had not seen any documents to support what the $11,130.50 check was for.

As in *Ganesan*, 96 S.W.3d at 354, without evidence of the payor and account number that were the source of the $12,000 check; the source of the funds that comprise the $12,171 deposit; and the recipient of the $11,130.50 check, we cannot conclude that Mike has shown that the trial court's finding that—using the clearinghouse method—he did not trace funds he used to purchase the mineral interests as his separate property is against the great weight and preponderance of the evidence or that the contrary finding is established as a matter of law. *See Dow Chem.*, 46 S.W.3d at 241.

### 3. Identical-Sum-Inference method

The trial court found that the identical-sum-inference method was not applicable to this case because there are at least three unequal sums presented by the evidence.

Mike describes the identical-sum-inference method as "a variation of the 'Clearinghouse Method' involving a single deposit and a single withdrawal of an identical or nearly identical amount," citing *McKinley*, 496 S.W.2d at 542-43. In that case, a party had $9,500 of undisputedly separate property in a savings account. *Id.* at 542. Interest accrued and was withdrawn. More interest and dividends accrued increasing the balance to $10,453.81. The party withdrew $10,450 and used those funds to purchase a savings certificate. The court held that $9,500 of the savings certificate was separate property. *Id.* at 543.

24

As set out above, the record in this case is not so tidy. The record supports the trial court's rejection of the identical-sum-inference-method tracing not because the amounts of the deposit into and the check from the joint account do not match, but because of the tracing deficiencies discussed above regarding the source of the $12,000 carbon check, proof that the $12,171 deposit was separate funds, and that the $11,130.50 check was used to purchase the mineral interests. As with the similar clearinghouse method of tracing, we cannot conclude that Mike has shown that the trial court's finding that—using the identical-sum-inference method—he did not trace funds he used to purchase the mineral interests as his separate property is against the great weight and preponderance of the evidence or that the contrary finding is established as a matter of law. *See Dow Chem.*, 46 S.W.3d at 241.

## CONCLUSION

We affirm the trial court's decree.

_____

Darlene Byrne, Chief Justice

Before Chief Justice Byrne, Justices Triana and Kelly

Affirmed

Filed: July 30, 2025

25